# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-00087-06-CR-W-NKL |
| | ) | |
| **ABDEL AZIM EL-SIDDIG**, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by Beth Phillips, United States Attorney for the Western District of Missouri and undersigned counsel, respectfully submits this Sentencing Memorandum, and response to the Sentencing Memorandum of Defendant Abdel Azim Elsiddig (D.E. 629.) For the reasons set forth below, the Government recommends that the Court impose a sentence consistent with the serious nature of his offense and the 18 U.S.C. § 3553(a) factors, followed by a three-year term of supervised release.

**I.     Offense of Conviction**

On July 7, 2010, on the eve of trial, the defendant pled a single-count Information, which charged him with conspiracy to violate the Foreign Agents Registration Act (22 U.S.C. §§ 612 and 618), in violation of 18 U.S.C. §§ 371.

The Information charged that:

A.     In or about March and April 2004, El-Siddig and co-defendant Mubarak Hamed hired co-defendant Mark Deli Siljander to advocate for co-defendant IARA's removal from a Senate Finance Committee list of charitable organizations suspected of supporting

international terrorism, and its reinstatement as an approved government contractor after its termination by USAID.

B. On or about April 28, 2004, Hamed, IARA, and El-Siddig agreed with Siljander to mischaracterize his efforts and relationship with IARA.

C. On or about May 18, 2004, El-Siddig paid Siljander $25,000.00, by means of a check, number 1005, payable to the International Foundation (with the notation indicating sub-account number 600-006, Muslim Friends).

D. On or about June 9, 2004, Siljander deposited check no. 7095 from IARA-USA, CEWIGAP account at Bank of America (then Boatmen's Bank), payable to the International Foundation, for approximately $25,000.00, into the Branch Bank and Trust, account ending in 3917, for credit to the sub-account of Muslim Friends, number 600-006.

E. On or about June 9, 2004, Siljander caused the deposit of an automated clearing house transfer (ACH) from an International Foundation account at Branch Bank and Trust for approximately $18,337.00 to his account with Merrill Lynch.

F. On or about September 2, 2004, Siljander deposited Check No. 7097 from the IARA-USA, CEWIGAP account at Bank of America (then Boatmen's Bank), payable to the National Heritage Foundation, for approximately $12,500.00, into James Monroe Bank, account ending in 0602, for credit to the sub-account of "Ambassaders for Peace and Reconciliation," number 1075388.

G. On September 2, 2004, Siljander deposited check no. 1204 from the IARA-USA, Mali Project account at Bank of America (then Boatmen's Bank), payable to the National Heritage Foundation, for approximately $12,500.00, into the James Monroe Bank, account ending in 0602, for credit to the sub-account "Ambassaders of Peace and Reconciliation," number 1075388.

H. On or about September 10, 2004, Siljander deposited check no. 71631 from the National Heritage Foundation, "Ambassadors of Peace and Reconciliation" sub-account, at the James Monroe Bank, payable to Global Strategies, Inc. c/o Mark Siljander for approximately $23,000 into his Branch Bank and Trust account ending in 0128.

I. On or about November 23, 2004, Siljander deposited check no. 75141 from the National Heritage Foundation, "Ambassadors of Peace and Reconciliation" sub-account, at James Monroe Bank, payable to Mark Siljander for approximately $1,350.00 into his account with Merrill Lynch.

J-M. At various times in and after June 2004, Siljander acted as a agent for a foreign principal, in that he contacted persons at USAID (J), the United States Department of Justice (K), the Senate Finance Committee (L), and the United States Department of the Army (M), in an effort to have IARA removed from the USAID list of debarred entities, and to remove IARA from the Senate Finance Committee list of charitable organizations suspected of supporting international terrorism.

N. At various times between June 2004 up and including October 2004, El-Siddig reported to Hamed and IARA on the progress of Siljander's efforts on behalf of IARA.

O. On December 15, 2005, Siljander falsely denied to federal agents that he had been hired to do any work for IARA, and falsely stated that all payments were charitable contributions for his writing a book.

## II. The Offense Conduct and Relevant Conduct

The offense conduct is set forth in the factual basis to the defendant's plea agreement. (D.E. 538:2-4.)

The defendant, Abdel Azim El-Siddig (El-Siddig) is a naturalized United States citizen and resident of Illinois. At all times relevant, El-Siddig was associated with, and worked as a fund-raiser for, the Islamic American Relief Agency.

Co-defendant Mark Deli Siljander (Siljander) is a United States citizen and was, at all times relevant, a resident of Virginia. Siljander, a former member of the United States House of Representatives from the State of Michigan, operated a consulting business known as Global Strategies, Inc. At no time relevant was Siljander a registered agent of any "foreign principal," as that term is defined in 22 U.S.C. § 611(b).

Co-defendant Islamic American Relief Agency (IARA) was an Islamic charitable organization based in Columbia, Missouri, that was the United States office of an international organization having more than 40 international offices, headquartered in Khartoum, Sudan. Originally, the Columbia, Missouri, office of IARA was incorporated under the name "Islamic

African Relief Agency-USA," and also was known as the Islamic African Relief Agency-United States Affiliate and IARA-USA. On May 25, 2000, the Islamic African Relief Agency-USA legally changed its name to the Islamic American Relief Agency.

At all times relevant, co-defendant Mubarak Hamed (Hamed) was the Executive Director of IARA, in Columbia, Missouri.

The organization of which IARA was a part, headquartered in Khartoum, Sudan, was known as the Islamic African Relief Agency, the acronym IARA, and also by the name Islamic Relief Agency, and the acronym ISRA. The organization had more than 40 international offices, over which the Khartoum, Sudan, headquarters exercised control. This control included the authority to appoint the chief executives of each international office, the authority to transfer personnel between international offices, the authority to decide what projects and goals the subordinate offices would and did undertake, and the authority to direct funds raised by one international office to projects undertaken by another office. Based on the degree of control exercised by the IARA/ISRA headquarters in Khartoum, Sudan, the IARA office in Columbia, Missouri, was a part of that organization, and was therefore a "foreign principal" as that term is defined in 22 U.S.C. § 611(b)(3).

Beginning about January 1, 1997, IARA entered into a series of written cooperative agreements with the United States Agency for International Development (USAID) for two relief projects in Mali, Africa. The agreements were terminated by USAID on or about December 19, 1999, and as of December 20, 1999, IARA was prohibited from obtaining any further USAID contracts. IARA was informed that the agreements were terminated because they were not in the United States' national interest. Later, IARA was debarred from any procurement transactions with any part of the Executive Branch of the United States government.

On January 14, 2004, IARA was included on a United States Senate Finance Committee list identifying charities suspected of funding terrorism. Shortly thereafter, Hamed and the Board of Directors decided that IARA should hire a person or persons to advocate for IARA's removal from the list.

On January 24, 2004, with the assistance of El-Siddig and Siljander, Hamed, on behalf of IARA, hired a former United States Congressman and registered lobbyist identified by the initials "R.P.H.," to advocate for IARA's removal from the list and reinstatement as an approved government contractor, by gathering information and meeting with individuals and agencies of the United States government. On January 24, 2004, Hamed signed a $15,000 check that was issued to R.P.H., drawn on IARA's principal bank account. For his assistance in brokering the transaction, Siljander received $6,000 in referral fees from R.P.H.

Between March and May 2004, Hamed and El-Siddig, on behalf of IARA, hired Siljander to advocate for IARA's removal from the list and reinstatement as an approved government contractor, by gathering information and meeting with individuals and agencies of the United States government.

Hamed, El-Siddig and Siljander each knew that IARA was controlled by the IARA/ISRA headquarters, in Khartoum, Sudan, and knowingly and willfully agreed with each other to mischaracterize Siljander's efforts and relationship with IARA. Hamed's discussions with Siljander included two telephone conversations which took place April 28, 2004, and May 6, 2004. In those conversations, they discussed the work Siljander was performing on behalf of IARA. Regarding the method of payment for the services, Siljander told Hamed, ". . . I think we oughta do this number one through foundations and not professionally," and advised Hamed to transfer funds from IARA

to himself by funneling them through non-profit entities. Siljander then relayed the details regarding how to transfer the funds to Hamed through El-Siddig.

On May 24, 2004, El-Siddig signed a $25,000 check that was issued to Siljander, drawn on an account at LaSalle Bank, in Chicago, Illinois, held in the name of IARA, which was made payable to an entity called the International Foundation. On May 27, 2004, Hamed signed a $25,000 check that was issued to Siljander, drawn upon IARA's North Mali account, which was made payable to an entity called the International Foundation. On August 26, 2004, Hamed signed two checks that were issued to Siljander, each in the amount of $12,500; the first was drawn upon IARA's North Mali account, and was made payable to an entity called the National Heritage Foundation, and the second was drawn upon IARA's Mali Project account, and was also made payable to National Heritage Foundation. All of these checks, totaling $75,000, were payments for Siljander's services.

At various times in and after June 2004, Siljander acted as an agent for a foreign principal in that he contacted persons at USAID, the United States Department of Justice, the United States Senate Finance Committee, and the United States Department of the Army, in an effort to have IARA removed from the USAID list of debarred entities, and to remove IARA from the Senate Finance Committee's list of charities suspected of funding terrorism.

At various times between June and October 2004, El-Siddig reported to IARA on the progress of Siljander's efforts on behalf of IARA.

El-Siddig admitted that he entered into a conspiracy with Siljander and Hamed to hire Siljander to act as the agent of a foreign principal, and to conceal this connection from the United States government.

**III.    Discussion**

### A. Applicable Law

Although the United States Sentencing Guidelines are no longer mandatory, *United States v. Booker*, 543 U.S. 220 (2005), sentencing still begins with a properly calculated advisory Sentencing Guidelines range, if such a range can be calculated. *See Gall v. United States*, 128 S. Ct. 586, 596 (2007); *Rita v. United States*, 127 S. Ct. 2456, 2464-65 (2007); *Booker*, 543 U.S. at 245-46; *United States v. Plaza*, 471 F.3d 928, 930 (8th Cir. 2006). Next, the Court must decide if a traditional departure under the Guidelines is appropriate, thus creating an advisory Guidelines sentencing range. *Plaza*, 471 F.3d at 930. After calculating the advisory Guidelines range, the Court considers that range, along with all the factors listed in 18 U.S.C. § 3553(a), in arriving at the final sentence. *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007); *Plaza*, 471 F.3d at 930.

The Guidelines remain a point at which to start the sentencing analysis, though they are only a part of the calculation. *United States v. De la Cruz Suarez*, 601 F.3d 1202, 1223 (11th Cir. 2010). A sentence within the advisory Guidelines range is not automatically reasonable. *Gall v. United States*, 552 U.S. 38, 50 (2007). However, at the appellate level, a presumption of reasonableness can be applied to a sentence within the Guidelines range. *Rita v. United States*, 551 U.S. 338, 347 (2007).

### B. The Guidelines Calculation

#### 1. PSR Recommendation

The final Presentence Investigation Report (PSR) was filed December 2, 2010. (D.E. 566.) The Sentencing Guidelines calculations set forth therein (¶¶ 39-50) recommend a base offense level of 12 for both the obstruction of justice and FARA violations, and a two-level reduction for

acceptance of responsibility, resulting in an a recommended total offense level of 10. With a criminal history category of I, the recommended advisory Guidelines range for incarceration would be between six and twelve months. (PSR ¶ 81.)

### 2. **Defendant's Objection**

The defendant objects to the PSR's use of U.S.S.G. § 2B1.1 as an analogous provision under the Guidelines. In distinguishing the conspiracy to violate FARA charge from the class of offenses covered by the general theft and fraud guideline, U.S.S.G. § 2B1.1, the defendant and Siljander argue that, unlike theft or embezzlement, FARA violations are purely regulatory offenses, which merely focus on whether a proper filing was made, as opposed to a felony that violates society's moral standards. The defendant's position is that no guideline expressly has been promulgated, U.S.S.G. § 2X5.1 directs that the most analogous Guideline is applied. If there is not a sufficiently analogous guideline, then the provisions of 18 U.S.C. § 3553 would control.

### 3. **Government Position**

To the extent that the defense objection argues U.S.S.G. § 2B1.1 is not sufficiently analogous, the Government agrees with the objection. As discussed *infra*, the Probation Office's recommendation that the most analogous guideline is that for economic crimes ignores the purpose and history of FARA, and is inconsistent with the facts of this case. Unlike a fraud case, the FARA offense in this case helps to protect the heart and essence of our national security and our political process from improper influence by foreign principals. FARA seeks to assist in the aim of informing and advising properly designated officials and the public of attempted foreign influence, control or direction within the political process or in political advocacy before Congress or the administration

of the Chief Executive. The United States Supreme Court has stated that "[t]he statute itself explains the basic purpose of the regulatory scheme." *Meese v. Keene*, 481 U.S. 465, 469 (1987). Specifically, FARA was originally enacted:

> [T]o protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities for or on behalf of foreign governments, foreign political parties, and other foreign principals so that the Government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in the light of their associations and activities.

*Id.* (quoting 56 Stat. 248-49 (1942), 22 U.S.C. § 611 Note on Policy and Purpose of Subchapter); *see also Viereck v. United States*, 318 U.S. 236, 244 (1943); *Attorney General v. Irish People*, Inc., 684 F.2d 928, 937-45 (D.C.C.1982).

Over the years, FARA's focus has gradually shifted from Congress' original concern about the political propagandist or subversive seeking to overthrow the Government, to lobbyists and persons acting on behalf of foreign governments or foreign principals in an attempt to influence the decision making process of United States government officials. However, FARA's purpose remains the same, namely that government officials and the public generally should be made aware of the identify and actions of those who act on behalf of a foreign principal. The idea is a frequently recurring one in modern government: public disclosure is needed in order for the government officials and the public to accurately to evaluate such activities. This case provides an excellent example. The defendants here were involved in either providing representation or conspiring to provide representation to IARA – an organization which the defendants admit they then knew was part of an international network controlled from Sudan, an organization which was then publicly identified by a Congressional committee as a suspected source of terrorism funding, and an

-9-

organization which was ultimately designated by the Treasury Department as a Specially Designated Global Terrorist. The parties have agreed that given the unique circumstances of this case, there is not a sufficiently analogous guideline provision. Therefore, the provisions of 18 U.S.C. § 3553 should control as to the FARA felony charge.

### C.    Analysis of the Factors Enunciated in 18 U.S.C. § 3553(a)

#### 1.    Nature and Circumstances of the Offense

The Government parts company from both the Probation Office and the defense in its analysis of the seriousness of the defendant's crime. As noted above, the PSR analogized the FARA offense to an economic crime. The defendant characterizes it as akin to the "regulatory-type" offense of say, failing to obtain the requisite license to undertake recreational hunting in a federal park. Both positions are fundamentally flawed.

It is important to understand that registering under FARA requires more than simply filling out a form indicating that one represents a foreign principal. Rather, a FARA registration is a comprehensive, detailed amount of publicly filed information occurring during the entire active status of a registration - using numerous forms and other submitted materials - that together allow a registrant/foreign agent to fully comply as Congress intended. *See* 22 U.S.C. § 612. These documents include copies of complete contracts and detailed supplemental statements that drill down to extensively show fees earned, expenses incurred, subcontractor partnerships, political meetings with policy makers, and categories and occurrences of media dissemination, etc. *Id*. The public availability and transparency of this information alerts United States officials and the public as to a foreign principal's agenda in the United States, which may include efforts to secure favor, raise funds, or direct perception management and public relations images in an attempt to influence

Congress or other public officials. Such information is therefore available for the public, Congress and other officials to evaluate such agendas for various purposes, including any impact on national security. Violation of FARA is a serious offense, punishable by up to five years in prison. *See* 22 U.S.C. § 618.

The government of the United States has determined as a matter of foreign and national security policy that agents of foreign principals must declare themselves prior to acting on behalf of those principals. The defendant willfully conspired to avoid this requirement, in order to conceal Siljander's work for his organization. In and of itself, this is a serious criminal offense.

Rendering his crime even more serious is the fact that the entity El-Siddig worked for, and recruited Siljander to advocate for, was located in Sudan, a state sponsor of terror, and had been specifically and publicly linked to terrorism financing and support for Osama bin Laden and al-Qaeda.

Rendering his crime even more serious is the fact that El-Siddig assisted Siljander in concealing his advocacy by hand-carrying checks from one non-profit entity to another.

The Government respectfully submits that the Court ought give considerable weight to the nature and circumstances of the defendant's crimes in fashioning a sentence.

2. **History and Characteristics of the Defendant**

Much of the defendant's sentencing memorandum is devoted to a discussion of his history and characteristics, supported by numerous letters of recommendation filed with the Court.

The defendant appears to be very well-connected to the current regime in Sudan, one of the most brutal on the planet. According to a May 13, 2006, *Washington Post* article, Siljander hosted a visit to the United States by Sudan's deputy foreign minister, Ali Karti (Karti). (*See* Exh. 1.) Sudan

-11-

Case 4:07-cr-00087-NKL   Document 641   Filed 01/09/12   Page 11 of 14

is on the State Department's list of state-sponsors of terrorism (*see* Exh. 2), and as noted in the article, Karti is widely considered to have been involved in major human rights violations in Darfur. In addition to Siljander, defendant El-Siddig was involved in this visit, during which Karti visited Siljander's clubhouse in suburban Washington D.C., along with the Sudanese ambassador and El-Siddig. (*See* Exh. 3.) Based on El-Siddig's apparent relationship to the current Sudanese regime, the Government suggests it is reasonable to infer he was fully aware of the nature of IARA/ISRA, a Specially Designated Global Terrorist organization, for which he served as an agent.

### 3. A Sentence Promoting Respect for the Law, and Serving as a Deterrent to Future Violations is Appropriate

Finally, in fashioning an appropriate sentence, the Government submits that the Court ought also focus on promoting respect for the law and the general deterrent effect of the sentence. Those employed by foreign organizations will take note of penalties meted out to similarly situated individuals, like El-Siddig, who violate the law. A sentence fully reflecting the serious nature of the crime will serve as a warning to those tempted to break the law on behalf of foreign principals. To accomplish this deterrence, a significant sentence of incarceration is both justified and necessary.

## IV. Conclusion

For the foregoing reasons, the Government respectfully recommends that the Court impose a sentence which is fully consistent with the serious nature of the offense, and with the other factors enumerated in 18 U.S.C. § 3553(a), followed by a three-year term of supervised release.

Respectfully submitted,

**BETH PHILLIPS**
United States Attorney


*/s/ Anthony P. Gonzalez*
**ANTHONY P. GONZALEZ**
Assistant United States Attorney


*/s/ Steven M. Mohlhenrich*
**STEVEN M. MOHLHENRICH**
Assistant United States Attorney


*/s/ Paul G. Casey*
**PAUL G. CASEY**
Trial Attorney, Counterterrorism Section
National Security Division
United States Department of Justice

-13-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on January 9, 2012, to the CM-ECF system of the United States District Court for the Western District of Missouri, and that a copy was delivered by electronic mail to counsel of record for the defendant.

*/s/ Anthony P. Gonzalez*
**ANTHONY P. GONZALEZ**
Assistant United States Attorney

-14-

Case 4:07-cr-00087-NKL   Document 641   Filed 01/09/12   Page 14 of 14